**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------

LUIS CARATTINI, III,

                              **Plaintiff,**

              -against-

CAROLYN W. COLVIN,
**Acting Commissioner of Social Security,**

                           **Defendant.**
------------------------------------------------------------

13 Civ. 7806 (ALC)

**MEMORANDUM AND OPINION**

**ANDREW L. CARTER, JR., District Judge:**

      Plaintiff Luis Carattini, III ("Carattini") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision by Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("the Commissioner") that denied his application for Supplemental Security Income ("SSI"). Before the Court are motions for judgment on the pleadings from both parties. Plaintiff moves for vacatur of the Commissioner's decision and remand for a *de novo* administrative hearing on three bases: (1) the Administrative Law Judge ("ALJ") of the Social Security Administration ("SSA") erred in evaluating certain medical opinion evidence, thereby failing to support his residual functional capacity ("RFC") determination with substantial evidence; (2) the ALJ erred in assessing Plaintiff's credibility, thereby failing to support his credibility determination with substantial evidence; and (3) the ALJ erred in not obtaining testimony from a vocational expert, thereby failing to support his RFC determination with substantial evidence. For the reasons elaborated herein, Plaintiff's motion is DENIED and the Commissioner's cross-motion is GRANTED because the Commissioner's findings were indeed based on substantial evidence in the record.

# BACKGROUND

## I.      *Procedural History*

Plaintiff applied for SSI on October 20, 2010, alleging disability beginning on that date.

Soc. Sec. Admin. R. at 16 (hereinafter "R. at __"). On February 15, 2011, the claim was denied.

R. at 16. Plaintiff filed a request for a hearing on March 6, 2011 and subsequently appeared and

testified before the ALJ on December 7, 2011 in Goshen, New York. R. at 16. On May 14,

2012, the ALJ issued a decision denying his application. R. at 13. On August 23, 2013, the SSA

Appeals Council denied Plaintiff's petition for review of the ALJ's determination. R. at 4. On

September 11, 2013, Plaintiff requested an extension of time to file suit in federal court seeking

review. R. at 3. On November 4, 2013, while its application to the Appeals Council was

pending, Carattini initiated this action. ECF No. 1. On December 9, 2013, the Appeals Council

granted Plaintiff an extension of 30 days, beginning from the date of receipt of its letter advising

as much, to file this suit. R. at 1.

## II.      *Factual Background*

### A.    **Medical Evidence**

#### i.  **Elena Kaznatcheeva, M.D.**

Plaintiff saw Dr. Elena Kaznatcheeva, a neurologist, three times, beginning on March 9,

2009 for a neurologic consultation. R. at 267-74. Accompanied by his mother, Plaintiff's chief

complaint during the first visit was that he had a learning disability. R. at 272. Dr.

Kaznatcheeva noted that Plaintiff had had difficulty learning, reading, and calculating since fifth

grade. R. at 272. Moreover, Dr. Kaznatcheeva wrote that, according to the mother, Plaintiff

needed questions read aloud to him while taking a driver's test. R. at 272. But, the doctor

pointed out, "the patient is able to use i-phone and communicate to his friends through the

internet." R. at 272. She described Plaintiff as "interest[ed] in interacting with his friends and playing on the computer games," but unhappy about his school. R. at 272. She further depicted him as "very pleasant," "very cooperative," and "alert and oriented," as well as "[w]ell-groomed, well-developed and nourished" with appropriate mood. R. at 272-73. Regarding his mental status, Dr. Kaznatcheeva made this assessment: "The patient is awake, alert, oriented to the place, time and person. Speech is fluent and clear. The patient is able to repeat name, comprehends, and follow-up three step commands. Affect is appropriate. Present and remote memory is intact. Fund of knowledge is fine." R. at 273. The doctor diagnosed Plaintiff's learning disability as "more likely alexia[1]." R. at 274.

Plaintiff's follow-up visit with Dr. Kaznatcheeva was on July 6, 2009, in which he complained mainly of difficulty reading. R. at 270. The doctor noted that Plaintiff needed assistance in his daily activities and that she was asked to complete paperwork required for Plaintiff to obtain a driver's license. R. at 270. Dr. Kaznatcheeva indicated that Plaintiff had no neurological symptoms. R. at 270. As before, the doctor noted that Plaintiff was "well-groomed, well-developed, and well-nourished," in addition to being "very pleasant." R. at 270. The neurologist repeated her March 2009 evaluation of Plaintiff's mental status, adding only that Plaintiff "refused" to read when requested. R. at 271.

Plaintiff paid Dr. Kaznatcheeva a third follow-up visit on March 29, 2010, complaining primarily of alexia. R. at 267. The doctor noted that Plaintiff had graduated from high school with an Individualized Education Program ("IEP")[2] diploma and was having trouble finding employment. R. at 267. Dr. Kaznatcheeva advised that Plaintiff's mother should assist him in

---

[1] "[A] neurologic disorder marked by loss of the ability to understand written or printed language, usually resulting from a brain lesion or a congenital defect." *Alexia*, DICTIONARY.COM, http://dictionary.reference.com/browse/alexia (last visited Mar. 27, 2015).

[2] The Court construes Dr. Kaznatcheeva's use of the acronym "IUP" as a typographical error. *See* R. at 21.

3

completing employment applications. R. at 267. The doctor further stated that despite Plaintiff's desire to be on disability, she had yet to receive any school records or neuropsychological evaluations of him. R. at 267. She had asked Plaintiff and his mother to bring his evaluations during Plaintiff's first visit more than a year earlier. R. at 274. Dr. Kaznatcheeva indicated that a social worker had helped Plaintiff adapt socially. R. at 267. Moreover, the doctor ascertained "[n]o depression, sadness or crying spells, loneliness or difficulty in sleeping," and repeated her previous descriptions of Plaintiff's mental status and appearance. R. at 267-68. As she had done during Plaintiff's prior two visits, the doctor wrote that his "[m]uscle bulk, strength and tone are normal." R. at 269, 271, 273. Dr. Kaznatcheeva diagnosed Plaintiff as having alexia and dyslexia. R. at 267.

### ii.  Jagruti Gohel, M.D.

Plaintiff visited Dr. Jagruti Gohel at Middletown Medical, P.C. on August 6, 2010 for a follow-up regarding blood tests that had been done. R. at 241. Like Dr. Kaznatcheeva had done repeatedly, Dr. Gohel described Plaintiff's appearance as "[a]lert and oriented" in addition to "[w]ell-groomed, well-developed and nourished" with appropriate mood. R. at 242. On May 17, 2011, Plaintiff saw Dr. Gohel again, this time expressing concern about his "possible dyslexia" and a desire to have paperwork completed for college. R. at 346. He informed Dr. Gohel that he had seen a neurologist.[3] R. at 346. Plaintiff did not have any other complaints or concerns. R. at 346. The doctor described a past medical history that included alexia and dyslexia. R. at 346. In assessing that Plaintiff had developmental dyslexia, Dr. Gohel expressly relied on the neurologist's diagnosis. R. at 347. He characterized Plaintiff's appearance and demeanor the same as he had done during their visit a year earlier. R. at 347. Dr. Gohel filled

---

[3] Presumably, the neurologist was Dr. Kaznatcheeva.

out a medical report for the New York State Education Department's Office of Vocational and Educational Services for Individuals with Disabilities ("VESID") diagnosing Plaintiff with developmental dyslexia. R. at 338. The form indicated that Plaintiff did not experience any limitations whatsoever from his disability that would impact his employment prospects, despite the doctor having been presented with options like "[i]mpaired [c]oncentration," "[u]nable to focus for sustained periods," "[d]ifficulty [c]oping," and "[n]eeds frequent breaks." R. at 338. Dr. Gohel wrote and underlined the word "None." The completed form also indicated that Plaintiff was not receiving treatment, and that his prognosis was good regardless of treatment. R. at 338.

On March 14, 2012, Dr. Gohel completed a form titled Medical Source Statement of Ability to do Work-Related Activities (Mental). R. at 348-50. The form presented a number of possible impairments to the doctor, as well as a range of intensity levels that included, in order of increasing severity: "None," "Mild," "Moderate," "Marked," and "Extreme." R. at 348-49. Moderate was defined as: "There is more than a slight limitation in this area but the individual is still able to function satisfactorily." R. at 348. Marked was defined as: "There is serious limitation in this area. There is a substantial loss in the ability to effectively function." R. at 348. Extreme was defined as: "There is major limitation in this area. There is no useful ability to function in this area." R. at 348. The only impairment identified as extreme by Dr. Gohel was the ability to "[u]nderstand and remember complex instructions." R. at 348-49. Dr. Gohel designated as markedly limited Plaintiff's abilities to "[c]arry out complex instructions," "make judgments on complex work-related decisions," "[i]nteract appropriately with the public," "[i]nteract appropriately with supervisor(s)," "[i]nteract appropriately with co-workers," and "[r]espond appropriately to usual work situations and to changes in a routine work setting." R. at

348-49.  However, Dr. Gohel described as only moderately impaired Plaintiff's ability to: "[u]nderstand and remember simple instructions," "[c]arry out simple instructions," and "make judgments on simple work-related decisions." R. at 348.

### iii.  Mary Kelly, Ph.D. and Jaman P. Welch, M.A.

Plaintiff saw Dr. Mary Kelly and Jaman Welch, both psychologists, on September 1 and 8, 2010.  R. at 233.  They completed a psychoeducational evaluation report.  R. at 233-38.  The psychologists noted that Plaintiff visited them at the Fisher Landau Center for the Treatment of Learning Disabilities, of the Albert Einstein College of Medicine, at the suggestion of his mother in order to "improve his skills and his vocational prospects."  R. at 233.  They indicated that he had "a history of learning disabilities and severe difficulty in reading."  R. at 33.  But Plaintiff was able to tell time on an analogue clock, though slowly, and had no trouble handling money. R. at 234.  Plaintiff expressed not thinking he could use public transportation if required.  R. at 234.  His driver's license had been revoked, and he had only passed the written permit test, after failing four or five times, once it was read to him.  R. at 234.  He could complete some, but not all, of an application form, and had trouble spelling.  R. at 234.

Plaintiff reported having only a few friends with whom he socialized.  R. at 234. However, he enjoyed going to the mall and the movies, as well as playing basketball, which he considered himself good at doing.  R. at 234.  The psychologists indicated that Plaintiff gave adequate attention to tasks, though had some difficulties understanding task instructions.  R. at 234.  He frequently requested clarification and had no such problems after the instructions were repeated or clarified.  R. at 234.  Plaintiff mentioned that aside from desiring to be an electrician, which he could not do because of the reading and math requirements, he had no other ideas about potential jobs.  R. at 234.

6

The results of the Wechsler Adult Intelligence Scale-IV ("WAIS-IV") administered to

Plaintiff determined that, overall, he was within the borderline range of intelligence. R. at 234.

However, the 30-point discrepancy between his verbal comprehension and perceptual reasoning

scores indicated that his nonverbal skills were more advanced than his verbal skills. R. at 234.

For this reason, the overall score "may not be a good summary measure of his current level of

functioning." R. at 236. The psychologists diagnosed Plaintiff with a learning disability and

referred Plaintiff to VESID for vocational counseling. R. at 237. They advised that his

vocational program should account for the fact that he would have difficulty acquiring new skills

through reading. R. at 237.

### iv.  M. Totin, Ph.D.

Dr. M. Totin, a psychologist, reviewed Plaintiff's medical record on February 14, 2011

and determined that Plaintiff suffered from a learning disorder and BIF[4]. R. at 314-15. Like Dr.

Gohel, Dr. Totin was presented with a list of potential functional limitations and a range of

intensity levels appearing, in order of increasing severity, as follows: "None," "Mild,"

"Moderate," "Marked," and "Extreme." R. at 324. The doctor assessed that Plaintiff was only

mildly limited in "Maintaining Social Functioning." R. at 324. Moreover, he was only

moderately limited in his "Activities of Daily Living" and in "Maintaining Concentration,

Persistence or Pace." R. at 324. Further, he had never experienced an extended episode of

decompensation. R. at 324.

On a form titled "Mental Residual Functional Capacity Assessment," Dr. Totin was

presented with a list of ability descriptions, next to which appeared, in order of increasing

---

[4] Dr. Totin may have been referring to "Borderline Intellectual Functioning." *See* Ann Logsdon, *What is Borderline Intellectual Functioning?*, ABOUT.COM (June 10, 2014), http://learningdisabilities.about.com/od/B/g/What-Is-Borderline-Intellectual-Functioning.htm.

severity, the following boxes: "No Evidence of Limitation in this Category," "Not Significantly Limited," "Moderately Limited," and "Markedly Limited." R. at 328. Plaintiff was described as not significantly limited in the following categories: the ability to (1) "remember locations and work-like procedures"; (2) "understand and remember very short and simple instructions"; (3) "carry out very short and simple instructions"; (4) "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; (5) "work in coordination with or proximity to others without being distracted by them"; (6) "make simple work-related decisions"; (7) "interact appropriately with the general public"; (8) "ask simple questions or request assistance"; (9) "accept instructions and respond appropriately to criticism from supervisors"; (10) "get along with coworkers or peers without distracting them or exhibiting behavioral extremes"; (11) "maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness"; and (12) "be aware of normal hazards and take appropriate precautions." R. at 328-29.

Further, Plaintiff was determined to be only moderately limited in the following respects: the ability to (1) "understand and remember detailed instructions"; (2) "carry out detailed instructions"; (3) "maintain attention and concentration for extended periods"; (4) "sustain an ordinary routine without special supervision"; (5) "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods"; (6) "respond appropriately to changes in the work setting"; (7) "travel in unfamiliar places or use public transportation"; and (8) "set realistic goals or make plans independently of others." R. at 328-29. Plaintiff was not found to have marked limitations in any of the categories. R. at 328-29.

Dr. Totin's conclusion was that, "[b]ased on the available evidence, it appears that claimant would be capable of performing simple work tasks." R. at 326.

## B.   Administrative Hearing

The ALJ framed the issue to be decided as whether Plaintiff is disabled under Section 1614(a)(3)(A) of the Social Security Act[5] and concluded that Plaintiff did not meet the criteria for disability. R. at 16-17. The ALJ made several findings of fact in the course of the required five-step inquiry[6] that led him to this result. R. at 18-20. He determined that Plaintiff had not been engaged in substantial gainful activity, as defined under 20 C.F.R. § 416.972(a)[7]-(b)[8], since his application for SSI on October 20, 2010. R. at 18. He concluded that Plaintiff had developmental dyslexia and a learning disability, which qualify as severe impairments under 20 C.F.R. § 416.920(c)[9].

However, the ALJ found that these impairments did not, whether considered separately or in combination, "meet[] or equal[] one of our listings in appendix 1 to subpart P of part 404 of this chapter and meet[] the duration requirement," which would have resulted in a finding of disability. 20 C.F.R. § 416.920(a)(4)(iii). R. at 19-20. He noted specifically that Plaintiff was only mildly restricted with respect to activities of daily living, since he could handle his personal

---

[5] "Except as provided in subparagraph (C), an individual shall be considered to be disabled for purposes of this subchapter if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."

[6] 20 C.F.R. § 416.920(4)(i)-(v).

[7] "Substantial work activity is work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before."

[8] "Gainful work activity is work activity that you do for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized."

[9] "You must have a severe impairment. If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience."

needs independently, shop, and help with cleaning and laundry. R. at 19. Likewise, he assessed that Plaintiff had only mild difficulties functioning socially based on the positive familial relationships he reported and his maintenance of social interactions with his friends, such as visiting the mall and going to the movies with them. R. at 19. The ALJ gauged that in the areas of concentration, persistence, and pace, Plaintiff had moderate impediments. R. at 19. He ascertained that although Plaintiff had some cognitive deficits, they did not prevent him from understanding, remembering, and executing simple instructions. R. at 19. Moreover, he could "sustain enough attention and concentration to play video games for hours at a time." R. at 19. The ALJ noted the consistency of this conclusion with the determination of Dr. M. Totin. R. at 19. Additionally, the ALJ found that Plaintiff had not experienced episodes of decompensation lasting for an extended period of time. R. at 19.

Next, the ALJ determined, after considering the full record—including "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence …. [as well as] opinion evidence"—Plaintiff had the RFC "to perform a full range of work at all exertional level[s]" except for the following non-exertional restrictions: Plaintiff should be limited to understanding, remembering, and carrying out simple, unskilled tasks. R. at 20. The ALJ concluded, in light of Plaintiff's age, education level, work history, and RFC, there was a significant number of suitable employment opportunities in the national economy. R. at 23.

In his decision, the ALJ explicitly based his factual findings on the medical evidence in the record and the testimony at the hearing. *See generally* R. at 18-24. He noted that Plaintiff was 22 years old with an 11th-grade education and no past relevant job history. R. at 20. He also mentioned that in the second grade, Plaintiff was found to be learning disabled and consequently

received special education services for the duration of his education. R. at 21. Yet, in spite of

his academic struggles across all subjects, especially math and comprehension, Plaintiff was able

to graduate in June 2009 with an IEP diploma. R. at 21. The ALJ addressed the fact that in

September 2010, Plaintiff was referred to Dr. Kelly, a psychologist, to receive a

psychoeducational evaluation in an effort to develop his reading skills and vocational

opportunities. R. at 21. The ALJ acknowledged Dr. Kelly's assessment that Plaintiff's basic

reading, spelling, and math skills were extremely poor. However, he also noted Dr. Kelly's

assessment that while Plaintiff "had some difficulty understanding task instructions, he

demonstrated no such difficulties after directions were repeated or clarified," and that "his

listening comprehension skills were significantly higher in comparison to his reading

comprehension." R. at 21.

The ALJ further cited the fact that although the Wechsler Adult Intelligence Scale, Fourth

Edition, reflected a full-scale IQ score of 74, indicating borderline intelligence, Dr. Kelly

determined that this score did not accurately reflect Plaintiff's level of functioning due to the

significant gap between his borderline verbal comprehension (70 percent) and average perceptual

reasoning (90 percent) scores. R. at 21. Indeed, the ALJ noted, after diagnosing him with

developmental dyslexia and a math disorder, Dr. Kelly referred Plaintiff to VESID for vocational

counseling and advised him to participate in a literacy program for adults. R. at 21. The ALJ

considered that there was no evidence in the record that Plaintiff ever attended the literacy

program, and that when asked during the hearing whether he had attended, Plaintiff did not recall

having done so. R. at 21. Likewise, Plaintiff had not taken advantage of VESID services. R. at

21. It was further observed that although Plaintiff's Pine Bush High School report card showed

him failing almost all of his courses, it also revealed poor attendance generally. R. at 21.

Next, the ALJ addressed the determination of Dr. Totin, a reviewing psychologist, on February 14, 2011 that Plaintiff possessed the ability to understand, remember, and execute simple directions, as well as abide by a regular schedule and engage appropriately with the public. R. at 21. Dr. Totin concluded that Plaintiff was capable of doing simple, unskilled tasks. R. at 22. The ALJ reasoned that the medical record, viewed holistically, as well as the "wide range of activities that the claimant is able to perform," supported Dr. Totin's opinion. R. at 22-23. Moreover, it was important that Dr. Totin was an expert in the area, which the ALJ described as receiving due consideration under 20 C.F.R. §§ 404.1527(d)(2)[10] and 416.927(d)(2)[11]. R. at 23.

The ALJ explained that "special significance" attaches to the opinion of a treating physician on the nature and severity of an impairment, and that when supported by objective medical evidence, the opinion becomes controlling absent good cause to the contrary. R. at 23. In this connection, the ALJ noted that although Plaintiff's long-time primary physician, Dr. Gohel, described him as having marked mental limitations, the ALJ was unconvinced that Plaintiff was limited to such an extent. R. at 23. As grounds for the ALJ's evaluation, he noted that during an office visit in May 2011, Dr. Gohel examined Plaintiff and completed paperwork expressing that Plaintiff "was fully oriented and presented with appropriate mood." R. at 23.

---

[10] The ALJ seems to have been referring to 20 C.F.R. § 404.1527(c)(2)(ii), which provides in relevant part: "Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.... For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain."

[11] The ALJ seems to have been referring to 20 C.F.R. § 416.927(c)(2)(ii), which, like § 404.1527(c)(2)(ii), provides in relevant part: "Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.... For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain."

The ALJ found that Dr. Gohel's subsequent opinion in March 2012 that Plaintiff had marked mental limitations was at odds with his assessment less than a year prior to that time. *See* R. at 23. Another reason the ALJ attached less weight to Dr. Gohel's opinion was that, as an internist, Dr. Gohel did not treat Plaintiff for any psychiatric issues and was not a specialist in that area. R. at 23. Finally, the ALJ noted that Dr. Gohel's March 2012 findings were inconsistent with Plaintiff's daily activities. R. at 23.

The ALJ did not credit Plaintiff's testimony during the hearing, in which he made allegations of debilitating symptoms, for several reasons. R. at 22. First, the ALJ found that Plaintiff's self-described daily activities are not constrained to the extent expected of an individual actually suffering from the disabling limitations he reported. R. at 22. By way of example, the ALJ noted that Plaintiff plays video games for several hours daily, whether through a game console or his Internet-enabled telephone. R. at 22. The ALJ also noted that Plaintiff was able to care independently for his personal needs, including cleaning and making himself sandwiches. R. at 22. Second, the ALJ determined that Plaintiff had received only sporadic, routine, and/or conservative treatment for his allegedly disabling symptoms. R. at 22. Third, the ALJ considered it noteworthy that when Plaintiff visited Dr. Kaznatcheeva, he advised her that he would like to be placed on disability. R. at 22. The ALJ interpreted this to be an instance of Plaintiff having "revealed his motive," noting that the neurological exam concluded that his memory was intact and that he was capable of following, at a minimum, three-step commands. R. at 22. Fourth, the ALJ also referred to the doctor's mentioning that Plaintiff could operate an iPhone and connect to the Internet, which contradicted Plaintiff's testimony. R. at 22. Fifth, the ALJ questioned whether Plaintiff's poor work history and continuing unemployment was due to something other than medical impairments. R. at 22.

Sixth, the ALJ perceived no evidence of debilitation during Plaintiff's testimony. R. at 22. The ALJ acknowledged that the hearing had been short and therefore did not provide conclusive evidence of the absence of debilitating symptoms, but he accorded his observation "some slight weight" in determining Plaintiff's credibility and RFC. R. at 22. The ALJ considered, for example, that Plaintiff was able to follow questioning from his representative and from the ALJ. R. at 22. Seventh, the ALJ noted that although Plaintiff had claimed an inability to work due to poor reading skills, he testified that he was able to complete job applications and a disability evaluation report, although his mother read the questions to him. R. at 22. On this subject, the ALJ also perceived Plaintiff's May 2011 request that Dr. Gohel complete paperwork to allow him to take college courses to be inconsistent with his claimed poor reading skills and inability to concentrate. R. at 22.

## STANDARD OF REVIEW

This Court's review of the Commissioner's decision is a deferential one, limited to verifying that the correct legal standards were applied and that the decision is supported by "substantial evidence" in the record. 42 U.S.C. §§ 405(g), 1383(c)(3); *Johnson v. Astrue*, 324 F. App'x 57, 58 (2d Cir. 2009) (summary order) (citing *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997)). Substantial evidence has been defined by the Supreme Court as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," which must be "more than a mere scintilla." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted). A plaintiff bears the burden of establishing the existence of a disability and the absence of evidence supporting a denial of benefits. *See Reynolds v. Colvin*, 570 F. App'x 45, 47 (2d Cir. 2014) (summary order) (citing *Talavera*, 697 F.3d at 153).

14

## DISCUSSION

I.      **Substantial Evidence Supports the ALJ's Evaluation of the Opinion Evidence of Drs. Totin and Gohel.**

A.      **Dr. Totin**

Plaintiff submits that the ALJ erred in evaluating the opinion evidence of Drs. Totin and

Gohel, thus failing to support his RFC determination with substantial evidence.  Residual

functional capacity is defined as "'the most a claimant can still do despite her limitations' in

terms of work-related physical and mental activities." *Fonseca v. Colvin*, No. 12 Civ. 5527,

2014 WL 297488, at *10 (S.D.N.Y. Jan. 28, 2014) (quoting 20 C.F.R. § 404.1545(a)(1))

(brackets omitted).  The ALJ found that Plaintiff had the RFC to perform the full range of work

at all exertional levels, with the following non-exertional restrictions: Plaintiff should be limited

to understanding, remembering, and carrying out simple, unskilled tasks.

Plaintiff argues that the RFC is unsupported by substantial evidence because the ALJ

"failed to reconcile the opinion of Dr. Totin with the above" RFC.  Pl.'s Mot. J.O.P. 8.

Specifically, his theory is that, in affording "great weight" to the opinion of Dr. Totin, the ALJ

erred by not accounting for the limitations described in the doctor's opinion. *Id.*  Plaintiff posits

that the following moderate limitations, as enumerated by Dr. Totin, should have been

accommodated in the RFC or, in the alternative, required an explanation as to why they were not

included as limitations in the RFC: (1) difficulty concentrating for extended periods, (2) need for

special supervision in order to sustain an ordinary routine, (3) difficulty maintaining a consistent

pace without an unreasonable number and length of rest periods, (4) difficulty responding to

changes in the work setting, and (5) difficulty setting goals and independently making plans. *See*

*id.* at 9.

But the ALJ addressed these limitations—which concern concentration, persistence, pace, and independence—at Step Three. After acknowledging Plaintiff's moderate difficulties in "concentration, persistence, or pace," the ALJ noted that he would nevertheless "be able to understand, remember and carry out simple instructions and directions," and that this was "consistent with the assessment of State Agency medical consultant M. Totin." R. at 19. The ALJ proceeded to note that Plaintiff's ability to concentrate clearly was not debilitating because he possessed enough of it to be able to "play video games for hours at a time." R. at 19. The ALJ found even less cause for concern regarding Plaintiff's level of independence. He described Plaintiff as only mildly restricted in his activities of daily living, and referred to Plaintiff's self-reported ability to independently take care of his personal needs, such as shopping at the mall and going to the movies with his friends, as well as helping with cleaning and laundry. The ALJ explicitly grounded the aforementioned conclusions in the evidentiary record.

Further, the Second Circuit has held that a RFC articulation need not expressly include limitations noted at Step Three; rather, "Step Four findings need only afford an adequate basis for meaningful judicial review, apply the proper legal standards, and be supported by substantial evidence such that additional analysis would be unnecessary or superfluous." *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (internal quotation marks omitted) (brackets omitted). In *McIntyre*, Plaintiff urged that her RFC should have referenced the ALJ's finding at Step Three, based on the notes of a psychiatric examiner, that she "has *only moderate* difficulties in maintaining social functioning and in maintaining concentration, persistence, and pace." *Id.* at 150 (emphasis added). The Second Circuit found it satisfactory that the ALJ had considered the same psychiatrist's opinion that she:

> (1) was capable of understanding and following simple instructions, and performing some complex tasks with supervision and independently; (2) appeared capable of maintaining

attention and concentration for tasks and could regularly attend to a routine and maintain a schedule; (3) appeared capable of learning new tasks, making appropriate decisions and relating to and interacting moderately with others; and (4) could deal with stress with the help of medication.

*Id.* at 150-51. The panel concluded: "Based on a thorough examination of the evidence of McIntyre's relevant limitations and restrictions, the ALJ concluded that McIntyre's impairments did not preclude her from light work, subject to specified modifications." *Id.* at 151.

Similarly, here the Court is satisfied that the ALJ, in considering the entire record, and in particular Dr. Totin's opinion, reviewed certain mitigating points in Dr. Totin's opinion before deciding the doctor's impression of Plaintiff's "only moderate" limitations did not rise to the level of requiring inclusion in the RFC.  Those mitigating points were Plaintiff's minimally impacted ability to: (1) remember locations and work-like procedures; (2) understand and remember very short and simple instructions; (3) carry out very short and simple instructions; (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) work in coordination with or proximity to others without being distracted by them; (6) make simple work-related decisions; (7) interact appropriately with the general public; (8) ask simple questions or request assistance; (9) accept instructions and respond appropriately to criticism from supervisors; (10) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (11) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and (12) be aware of normal hazards and take appropriate precautions.

Therefore, aside from the other supportive medical evidence and self-reported daily activities in the record, there was substantial evidence for the ALJ to conclude based on Dr. Totin's opinion alone that Plaintiff's moderate limitations did not preclude him from performing the full range of exertional work at all exertional levels, subject to the modifications that he be

17

restricted to understanding, remembering, and carrying out simple, unskilled tasks. This is even more obvious considering what the ALJ knew about the kinds of jobs that correspond to Plaintiff's RFC. *See infra* Part III.

**B.      Dr. Gohel**

Plaintiff's second argument is that the ALJ improperly withheld controlling weight from the opinion of Dr. Gohel, Plaintiff's primary physician. A treating source's opinion on the nature and severity of an individual's impairment is given controlling weight only if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If a treating source's opinion is not given controlling weight, factors, including the length, nature and extent of a treatment relationship, existence of supportive evidence, and consistency of the opinion with the record as a whole, are considered in determining the weight to assign the opinion. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

There is substantial evidence for the ALJ's determination, after considering the complete record, that Dr. Gohel's opinion was entitled to less than controlling force. On March 14, 2012, Dr. Gohel completed a form describing Plaintiff as having several marked mental limitations. However, the ALJ was unpersuaded that Plaintiff was limited to that degree. The ALJ noted that during an office visit in May 2011, during which Plaintiff expressed concern about his dyslexia, Dr. Gohel examined Plaintiff and completed paperwork expressing that Plaintiff "was fully oriented and presented with appropriate mood." The ALJ concluded that Dr. Gohel's opinion in March 2012 that Plaintiff had marked mental limitations contradicted his assessment less than a year prior to that time. The ALJ indicated that another reason he attached less weight to Dr. Gohel's opinion was that, as an internist, Dr. Gohel did not treat Plaintiff for any psychiatric

18

issues and indeed was not a specialist in that area.  Lastly, the ALJ noted that Dr. Gohel's March 2012 findings were inconsistent with Plaintiff's daily activities.  Thus, Plaintiff has not met its burden of demonstrating the absence of a substantial basis for the ALJ's decision to not accord Dr. Gohel's opinion controlling weight.

## II.   Substantial Evidence Supports the ALJ's Finding that Plaintiff's Testimony Was Not Totally Credible

When determining a claimant's credibility, an ALJ must "take the claimant's reports of pain and other limitations into account, [but] he or she is not require[d] to accept the claimant's subjective complaints without question" and can weigh the "credibility of the claimant's testimony in light of the other evidence in the record." *Campbell v. Astrue*, 465 F. App'x 4, 7 (2d Cir. 2012) (summary order) (citations and internal quotation marks omitted); *see also* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.929(b).

The ALJ provided several reasons for why he did not credit Plaintiff's testimony, in which he made allegations of debilitating symptoms.  Those reasons clearly amount to substantial evidence.  First, the ALJ determined that Plaintiff's self-described daily activities are not restricted to the extent expected of a person actually suffering from his alleged disabling symptoms and limitations.  The ALJ referenced, by way of example, that Plaintiff plays video games for several hours daily, both through a game console and his Internet-enabled telephone.  The ALJ further observed that Plaintiff was able to care independently for his needs, such as by cleaning and making himself sandwiches.

Second, the ALJ found that Plaintiff had received only sporadic, routine, and/or conservative treatment for his allegedly disabling symptoms, suggesting at a minimum that Plaintiff exaggerated their severity.  Third, the ALJ considered it noteworthy that when Plaintiff

visited Dr. Kaznatcheeva, he advised her that he would like to be placed on disability.  The ALJ interpreted this to be an instance of Plaintiff having "revealed his motive," noting that the neurological exam concluded that his memory was intact and that he was capable of following, at a minimum, three-step commands.  Plaintiff contends that, according to the ALJ's logic, "in applying for disability, every claimant reveals a 'motive' to be on disability."  Pl.'s Mot. J.O.P. 14.  However, when viewed in the context of all of the reasons the ALJ gave for discounting Plaintiff's testimony, the ALJ's interpretation was reasonable.  Fourth, the ALJ referred to Dr. Kaznatcheeva's notation that Plaintiff could operate an iPhone and connect to the Internet, which contradicted Plaintiff's testimony during the hearing.  Fifth, the ALJ questioned whether Plaintiff's poor work history and continuing unemployment was due to something other than medical impairments.  Presumably, the ALJ suspected Plaintiff did not desire to work, which again would have been a reasonable interpretation in context.

Sixth, the ALJ witnessed no evidence of debilitation during the testimony.  He acknowledged that the hearing had been short and thus did not provide conclusive evidence of the absence of debilitating symptoms.  However, he assigned his observation "some slight weight" in determining Plaintiff's credibility and RFC.  For example, he considered that Plaintiff was able to follow questioning from his representative and from the ALJ.  *See Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998) ("[i]n instances where the individual attends an administrative proceeding conducted by the adjudicator, the adjudicator may also consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements") (internal quotation marks omitted).

Seventh, the ALJ noted that despite Plaintiff having previously alleged an inability to work due to poor reading skills, he testified that he was capable of completing job applications

and a disability evaluation report, although his mother read the questions to him.  In this vein, the ALJ described Plaintiff's May 2011 request that Dr. Gohel complete paperwork allowing him to take college courses to be inconsistent with his claimed poor reading skills and inability to concentrate.  Considering these points in totality, there can be no doubt that substantial evidence existed for the ALJ to reach his conclusion.

**III.     Substantial Evidence Supports the RFC Without a Vocational Expert Opinion**

Plaintiff cites no authority for the proposition that the ALJ needed to consult a vocational expert as a prerequisite for the existence of substantial evidence under these facts.  To the contrary, consultation is optional.  "At Step Five, the Commissioner must determine that significant numbers of jobs exist in the national economy that the claimant can perform.  An ALJ may make this determination either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert."  *McIntyre*, 758 F.3d at 151 (2d Cir. 2014) (internal citations omitted).  Here, the ALJ adopted the former approach.

Social Security Ruling 85-15 ("SSR 85-15") is instructive in describing the jobs in the national economy that are suitable for Plaintiff:

> Where there is no exertional impairment, unskilled jobs at all levels of exertion constitute the potential occupational base for persons who can meet the mental demands of unskilled work. These jobs ordinarily involve dealing primarily with objects, rather than with data or people, and *they generally provide substantial vocational opportunity for persons with solely mental impairments* who retain the capacity to meet the intellectual and emotional demands of such jobs on a sustained basis.

Capability to Do Other Work-The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments, SSR 85-15, 1985 WL 56857, at *4 (1985) (emphasis added). The RFC expressly mentions that Plaintiff is limited to understanding, remembering, and carrying out simple, unskilled tasks.  However, the ALJ reasonably determined that "these

limitations have little or no effect on the occupational base of unskilled work at all exertional levels." R. at 24. Indeed, 20 C.F.R. § 416.921(b) provides support for this conclusion in the following description of basic work activities:

> When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include—(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting.

Therefore, contrary to what Plaintiff contends, it was not necessary to obtain the opinion of a vocational expert to further specify the kinds of jobs available in the national economy for Plaintiff given the limitations acknowledged in the RFC.

## CONCLUSION

For the aforementioned reasons, Plaintiff's motion for judgment on the pleadings is DENIED and Defendant's cross-motion for judgment on the pleadings is GRANTED. The Clerk of Court is respectfully directed to terminate ECF Nos. 12 and 18.

**SO ORDERED.**

Dated:  **March 31, 2015**
         **New York, New York**

_____
        **ANDREW L. CARTER, JR.**
        **United States District Judge**

22